# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Terry Lee Stimmel, | ) | CASE NO: 5:14CV2081 |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | **ORDER AND DECISION** |
| | ) | |
| Loretta Lynch,et al., | ) | (Resolving Doc. 6) |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the Court is Defendants' motion to dismiss the complaint (Doc.

6).  Plaintiff Terry Lee Stimmel has opposed the motion, and Defendants have replied.

The motion to dismiss is GRANTED.

## I.  Legal Standard

The Sixth Circuit stated the standard for reviewing a motion to dismiss in *Assn. of*

*Cleveland Fire Fighters v. Cleveland*, 502 F.3d 545 (6th Cir. 2007) as follows:

> The Supreme Court has recently clarified the law with respect to what a
> plaintiff must plead in order to survive a Rule 12(b)(6) motion.  *Bell Atl.*
> *Corp. v. Twombly*, 550 U.S. 544 (2007). The Court stated that "a
> plaintiff's obligation to provide the grounds of his entitlement to relief
> requires more than labels and conclusions, and a formulaic recitation of
> the elements of a cause of action will not do." *Id.* at 1964-65 (citations and
> quotation marks omitted). Additionally, the Court emphasized that even
> though a complaint need not contain "detailed" factual allegations, its
> "[f]actual allegations must be enough to raise a right to relief above the
> speculative level on the assumption that all the allegations in the
> complaint are true." *Id.* (internal citation and quotation marks omitted).  In
> so holding, the Court disavowed the oft-quoted Rule 12(b)(6) standard of
> *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (recognizing "the accepted
> rule that a complaint should not be dismissed for failure to state a claim
> unless it appears beyond doubt that the plaintiff can prove no set of facts

> in support of his claim which would entitle him to relief"), characterizing
> that rule as one "best forgotten as an incomplete, negative gloss on an
> accepted pleading standard." *Twombly*, 550 U.S. at 563.

*Id.* at 548.  Instead, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal quotations omitted).

If an allegation is capable of more than one inference, this Court must construe it in the plaintiff's favor.  *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (citing *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993)).  This Court may not grant a Rule 12(b)(6) motion merely because it may not believe the plaintiff's factual allegations.  *Id*.  Although this is a liberal standard of review, the plaintiff still must do more than merely assert bare legal conclusions.  *Id.*  Specifically, the complaint must contain "either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory."  *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quotations and emphasis omitted).

## II. Facts

On November 6, 1997, Plaintiff Terry Stimmel pled no contest to domestic violence, a first degree misdemeanor.  The victim was his wife at the time, Doris Stimmel.  In 2002, Stimmel sought to purchase a firearm from his local Wal-Mart. Stimmel was informed by the salesperson that he failed the required background check and could not purchase a firearm.  Stimmel appealed the denial of his purchase to the FBI.  His appeal was denied because his conviction rendered him ineligible to own a firearm under 18 U.S.C. § 922(g)(9).  Stimmel now alleges that he desires to purchase and own a firearm for defending himself and his home.  As such, he now seeks a

declaration that 18 U.S.C. § 922(g)(9) violates his Second Amendment rights and that certain acts by Congress have violated his right to equal protection under the law.  The Government defendants have sought to dismiss the complaint for failure to state a claim upon which relief can be granted.  The Court now resolves the motion.

### III. Analysis

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual's right to keep and bear arms without regard to Militia service. *Id.* at 595, 598–99. The Court held that the Second Amendment codified the pre-existing right to keep and bear arms. *See id.* at 592 (noting that "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right"). The core right recognized in *Heller* is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

At the present time, *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) provides the framework for analyzing a Second Amendment claim in the Sixth Circuit.[1]

> Since the Supreme Court's decision in *Heller*, courts have wrestled with its text to develop a sound approach to resolving Second Amendment challenges. Several circuits have adopted a two-pronged approach. *See United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) ("As we read *Heller*, it suggests a two-pronged approach to Second Amendment challenges."); *Chester*, 628 F.3d at 680 (applying two-pronged approach); *Ezell v. City of Chicago*, 651 F.3d 684, 701–03 (7th Cir. 2011) (same); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir.2010) (same).

---

[1] As the notice filed by the Government indicates, there is currently pending an *en banc* review in *Tyler v. Hillsdale County Sheriff's Dept.* that could alter Second Amendment review within this Circuit.  However, absent resolution of that review, *Greeno* remains the standard in this Circuit.

Under the first prong, the court asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood. *Chester*, 628 F.3d at 680. As the Seventh Circuit recognized, "*Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified." *Ezell*, 651 F.3d at 702. If the Government demonstrates that the challenged statute "regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 [Bill of Rights ratification] or 1868 [Fourteenth Amendment ratification]—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id*. at 702–03.

"If the government cannot establish this—if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* at 703. Under this prong, the court applies the appropriate level of scrutiny. *Marzzarella*, 614 F.3d at 89. If the law satisfies the applicable standard, it is constitutional. *Id*. If it does not, "it is invalid." *Id*.

We find this two-pronged approach appropriate and, thus, adopt it in this Circuit.

*United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012).

In examining the first prong of the test adopted in *Greeno*, this Court must be mindful that the Second Amendment right to keep and bear arms "is not unlimited." *Heller*, 554 U.S. at 626.  *Heller* explained that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. While not defining the full scope of the Second Amendment right, *Heller*'s dicta noted:

> [N]othing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 626–27, 627 n. 26. "Relying on that language from *Heller*, this Court has held that § 922(g)(1) comports with the Second Amendment, stating that 'prohibitions on felon possession of firearms do not violate the Second Amendment,' and 'Congress's prohibition on felon possession of firearms is constitutional.' *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010)."  *United States v. Whisnant*, 391 Fed. Appx. 426, 430 (6th Cir. 2010).

18 U.S.C. § 922(g)(9) provides that it is unlawful for any person "who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  In its motion, the Government urges that this type of prohibition is one that existed prior to the enactment of the Second Amendment and therefore falls outside the scope of the Amendment.  In response, Stimmel contends that "the crime of domestic violence is of more recent vintage than the ratification of either the Bill of Rights or of the Fourteenth Amendment."  Doc. 9 at 10. Stimmel then details that historically, well into the 1800s, it was not a crime for a husband to physically assault his wife in some capacity.  Based upon those facts, Stimmel

asserts that the prohibition at issue regulates activity that was traditionally within the scope of the Second Amendment.

Stimmel's arguments regarding the "more recent vintage" of domestic violence laws have been squarely rejected in an analogous context by the Sixth Circuit in *Greeno*:

> The mere fact that drug laws and the Section 2D1.1(b)(1) enhancement were not enacted until recently does not automatically render the possession of weapons by drug traffickers within the scope of the Second Amendment right as historically understood. Nothing in *Heller* suggests such a static reading of the Second Amendment. Thus, we look to the broader question of whether the Second Amendment right, as historically understood, protected the possession of weapons by individuals engaged in criminal activity.

*Greeno*, 679 F.3d at 519. In that regard, *Greeno* cites *State v. Hirsch*, 338 Or. 622, 676 (Or. 2005) which noted that "[n]othing in the history of the English right suggests that the drafters of the English Bill of Rights intended the arms provision to preclude the disarmament of serious lawbreakers."

In that final aspect, Stimmel contends that such a provision is inapplicable herein because misdemeanor domestic violence cannot categorically be labeled a "serious" offense. In support, Stimmel notes that "[t]here is no support for the proposition that a mere offensive touching, especially against one's spouse, was historically understood to disqualify one from the Second Amendment's protection." Doc. 9 at 11. In so arguing, Stimmel effectively urges that the prohibition is overly broad because it conceivably affects those convicted of "minor" domestic violence offenses. This Court, however, finds itself in agreement with the now vacated, pending *en banc* review, decision in *Tyler Hillsdale County Sheriff's Dept.*, 775 F.3d 308, 337 (6th Cir. 2014) for the uncontroversial notion that "[d]omestic-violence misdemeanants, by definition, are violent and non-law-abiding[.]"

6

This Court finds that Stimmel's claims do not implicate the Second Amendment. When enacting this prohibition, Congress recognized that existing felon-in-possession laws

> were not keeping firearms out of the hands of domestic abusers, because "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies." 142 Cong. Rec. 22985 (1996) (statement of Sen. Lautenberg). By extending the federal firearm prohibition to persons convicted of "misdemeanor crime[s] of domestic violence," proponents of § 922(g)(9) sought to "close this dangerous loophole." *Id.*, at 22986.

> Construing § 922(g)(9) to exclude the domestic abuser convicted under a generic use-of-force statute (one that does not designate a domestic relationship as an element of the offense) would frustrate Congress' manifest purpose. Firearms and domestic strife are a potentially deadly combination nationwide.

*United States v. Hayes*, 555 U.S. 415, 426 (2009).  The Seventh Circuit expanded on this analysis at length in *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010):

> Start with prosecuting domestic violence as a misdemeanor when similar acts against a stranger would be a felony (a practice often called "undercharging"). Prosecutors face two major obstacles to obtaining felony convictions: some family members are willing to forgive the aggressors in order to restore harmonious relations, while others are so terrified that they doubt the ability of the police to protect their safety. Either way, victims of domestic violence are less willing to cooperate with prosecutors, who may need to reduce charges to obtain even limited cooperation and thus some convictions. *See* Eve S. Buzawa & Carl G. Buzawa, *Domestic Violence: The Criminal Justice Response* 177–89 (3d ed.2002). Indeed, either forgiveness or fear induces many victims not to report the attack to begin with. The result is that many aggressors end up with no conviction, or a misdemeanor conviction, when similar violence against a stranger would produce a felony conviction. *See, e.g., Report of the Florida Supreme Court Gender Bias Study Commission*, reprinted in 42 Fla. L.Rev. 803, 859–60 (1990); Sarah Eaton & Ariella Hyman*, The Domestic Violence Component of the New York Task Force Report on Women in the Courts: An Evaluation and Assessment of New York City Courts*, 19 Fordham Urb. L.J. 391, 461–62 (1992); Patrick A. Langan & Christopher A. Innes, *Preventing Domestic Violence Against Women* 2 (Bureau of Justice Statistics 1986).

That firearms cause injury or death in domestic situations also has been established. Domestic assaults with firearms are approximately twelve times more likely to end in the victim's death than are assaults by knives or fists. Linda E. Saltzman, James A. Mercy, Patrick W. O'Carroll, Mark L. Rosenberg & Philip H. Rhodes, *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 J. Am. Medical Ass'n 3043 (1992). Part of this effect stems from the fact that some would-be abusers go buy a gun, *see* Susan B. Sorenson & Douglas J. Wiebe, *Weapons in the Lives of Battered Women*, 94 Am. J. Pub. Health 1412 (2004), and much from the fact that guns are more lethal than knives and clubs once an attack begins. *See* Zimring, *Firearms & Violence, supra*. The presence of a gun in the home of a convicted domestic abuser is "strongly and independently associated with an increased risk of homicide." Arthur L. Kellermann, et al., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New England J. Medicine 1084, 1087 (1993). *See also, e.g.*, Jacquelyn C. Campbell, et al., *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*, 93 Am. J. Pub. Health 1089, 1090 (2003); James E. Bailey, et al., *Risk Factors for Violent Death of Women in the Home*, 157 Archives of Internal Medicine 777 (1997); Douglas J. Wiebe, *Homicide and Suicide Risks Associated with Firearms in the Home: A National Case–Control Study*, 41 Annals of Emergency Medicine 771 (2003). And for this purpose the victims include police as well as spouses, children, and intimate partners. Responding to a domestic-disturbance call is among an officer's most risky duties. Approximately 8% of officers' fatalities from illegal conduct during 1999 through 2008 arose from attempts to control domestic disturbances. FBI, *Law Enforcement Officers Killed and Assaulted 2008* Table 19 (2009).

Finally, the recidivism rate is high, implying that there are substantial benefits in keeping the most deadly weapons out of the hands of domestic abusers. For example, a study of persons arrested for misdemeanor domestic violence in Cincinnati concluded that 17% of those who remained in the area were arrested again for domestic violence within three years. John Wooldredge & Amy Thistlethwaite, *Reconsidering Domestic Violence Recidivism: Individual and Contextual Effects of Court Dispositions and Stake in Conformity* vi (1999). The full recidivism rate includes violence that does not lead to an arrest. Estimates of this rate come from survey research and range from 40% to 80% "when victims are followed longitudinally and interviewed directly." Carla Smith Stover, *Domestic Violence Research*, 20 J. Interpersonal Violence 448, 450 (2005). See also Julia C. Babcock, et al., *Does Batterers' Treatment Work? A Meta–Analytic Review of Domestic Violence Treatment*, 23 Clinical Psychology Rev. 1023, 1039 (2004) (estimating a 35% recidivism rate based on partners' reports). Skoien cites, as if it were favorable, a

> study showing that within three years of conviction 48% of domestic
> abusers "suspended" their abusive conduct—which means that the other
> 52% did not, and that even the 48% may have committed new crimes
> within three years after conviction. John H. Laub & Robert J. Sampson,
> *Understanding Desistance from Crime*, 28 Crime & Justice 1, 31 (2001).
> No matter how you slice these numbers, people convicted of domestic
> violence remain dangerous to their spouses and partners.

*Id.* at 643-44.  Based upon the analysis contained in *Skoien*, this Court finds that the

prohibition at issue falls squarely within the authority to disarm serious lawbreakers in

existence well before the enactment of the Second Amendment.  Accordingly, Stimmel's

claim does not implicate the Second Amendment.

In this regard, the Court finds itself in disagreement with the holding in *United*

*States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) that suggests that the Government must

show that "that domestic violence misdemeanants in particular have historically been

restricted from bearing arms."  *Id.* at 1137.  This argument is precisely the type of static

reading of the Second Amendment that the Sixth Circuit rejected in *Greeno*.

However, assuming for the sake of argument that Stimmel has properly raised a

Second Amendment claim related to 18 U.S.C. § 922(g)(9), this Court joins with every

other Court that has found that the prohibition does not run afoul of the Constitution.  In

that regard, at least six circuit courts have upheld this prohibition.  *See United States v.*

*Booker*, 644 F.3d 12 (1st Cir. 2011); *United States v. Staten*, 666 F.3d 154 (4th Cir.

2011); *United States v. Skoien* (*Skoien II*), 614 F.3d 638 (7th Cir. 2010) (en banc); *United*

*States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013*); In re United States*, 578 F.3d 1195 (10th

Cir.2009) (unpublished order but appended to published dissent) (granting a petition for a

writ of mandamus directing the district court not to instruct jury that § 922(g)(9) is

inapplicable for persons who do not pose a risk of violence); *United States v. White*, 593 F.3d 1199 (11th Cir. 2010).

In analyzing the level of scrutiny to give to a Second Amendment challenge to the prohibition at issue, *Chovan* noted:

> In determining the appropriate level of scrutiny, other circuit courts have looked to the First Amendment as a guide. *See, e.g., Chester*, 628 F.3d at 682; *Marzzarella*, 614 F.3d at 89 n. 4, 96–97; *Ezell*, 651 F.3d at 703, 707. We agree with these courts' determination that, just as in the First Amendment context, the level of scrutiny in the Second Amendment context should depend on "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *See Chester*, 628 F.3d at 682; *see also Marzzarella*, 614 F.3d at 96–97. More specifically, the level of scrutiny should depend on (1) "how close the law comes to the core of the Second Amendment right," and (2) "the severity of the law's burden on the right." *Ezell*, 651 F.3d at 703.
>
> *Heller* tells us that the core of the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. Section 922(g)(9) does not implicate this core Second Amendment right because it regulates firearm possession for individuals with criminal convictions. "Although [Chovan] asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense—by virtue of [Chovan]'s criminal history as a domestic violence misdemeanant." *Chester*, 628 F.3d at 682–83; cf. *Ezell*, 651 F.3d at 708 (finding that a challenged statute implicated the core Second Amendment right because "the plaintiffs are the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude under Heller ").

*Chovan*, 735 F.3d at 1138. Stimmel seeks a higher level of scrutiny through his contention that he is law-abiding. In support, Stimmel contends that he has been conviction-free since his 1997 domestic violence conviction. This Court believes that the analysis in *Chovan* persuasively rejects this argument for strict scrutiny.[2]  *See id.* (noting

---

[2] Very similar to Stimmel, Chovan's conviction had come fifteen years before his Constitutional challenge.

that § 922(g)(9) "amounts to a 'total prohibition'" on firearm possession … in fact, a 'lifetime ban'" while still finding intermediate scrutiny to be appropriate.).

Both strict scrutiny and intermediate scrutiny are "quintessential balancing inquiries that focus ultimately on whether a particular government interest is sufficiently compelling or important to justify an infringement on the individual right in question." *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1281 (D.C.Cir.2011) (Kavanaugh, J., dissenting). Under intermediate scrutiny, a challenged law "must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Under strict scrutiny, the government must show that a challenged law "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (citation omitted).

Herein, the Government has shown both an important governmental objective and a compelling interest.  "It is self-evident that the government interest of preventing domestic gun violence is important. *See Booker*, 644 F.3d at 25 ('[K]eeping guns away from people who have been proven to engage in [domestic] violence ... is undeniably important.' (citing *Carey v. Brown*, 447 U.S. 455, 471 (1980) ('The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.')))." *Chovan*, 735 F.3d at 1139-40.  Accordingly, the Government has met its initial burden under even a strict scrutiny analysis.

Similarly, the Government has demonstrated that the prohibition is narrowly tailored.  Like the evidence adduced in *Chovan*, the Government herein has "demonstrated that domestic violence misdemeanants are likely to commit acts of domestic violence again and that, if they do so with a gun, the risk of death to the victim

11

is significantly increased." *Id.* at 1140-41. As such, a prohibition on possession of firearms by that class of persons is tailored to serve the Government's compelling interest. Stimmel, however, contends that the prohibition is overbroad. In support, Stimmel contends that a lifetime ban can result from "simple assaults" which are not within "the category of 'serious' domestic violence offenses supposedly intended to be the target of the law." Doc. 9 at 13. However, this type of argument is foreclosed by *United States v. Castleman*, 134 S.Ct 1405, 1415 (2014) (rejecting the notion that a brief discussion of "severe" domestic violence incidents suggested that Congress intended the prohibition to only apply to those incidents). In fact, legislative history suggests that the prohibition was restricted to domestic violence involving the use or attempted use of physical force, signaling the type of conduct that Congress deemed "serious." *Id.* at 1415-16.

The Court also finds no merit in Stimmel's contention that Congress relied on out-of-date studies in determining recidivism rates and reporting rates for domestic violence. Stimmel contends that much of this data was recorded prior to mandatory arrest laws being enacted in many states. Stimmel, however, fails to offer how these arrest laws have or could impact the rates relied upon by Congress.

Additionally, the Court rejects Stimmel's assertion that the prohibition is overbroad because he has no realistic opportunity to secure the relief provided in 18 U.S.C. § 921 (a)(33)(B). This statute provides that expungement, pardon, or restoration of civil rights means that a conviction no longer disqualifies a person from possessing firearms, Stimmel, however, contends that "the politics of both firearms and domestic violence make a pardon beyond realistic to expect[.]" Doc. 9 at 16. Stimmel has not

12

sought to avail himself of this relief, so he has a much higher hurdle herein to challenge its adequacy.  Further, it is true that "the statute tolerates different outcomes for persons convicted in different states, but this is true of all situations in which a firearms disability (or any other adverse consequence) depends on state law. The Justices held in *Logan* that this variability does not call into question federal firearms limits based on state convictions that have been left in place under the states' widely disparate approaches to restoring civil rights." *Skoien*, 614 F.3d at 645.   Accordingly, this overbreadth challenge fails as well.

In his as-applied challenge, Stimmel contends that he is a law-abiding citizen and therefore must be granted some form of Second Amendment protection.  Stimmel asserts that his fifteen years without a conviction warrant such a conclusion.  The Ninth Circuit in *Chovan* rejected a nearly identical argument:

> But even if we were to set aside the March 2010 domestic abuse call and assume that Chovan has had no history of domestic violence since 1996, Chovan has not presented evidence to directly contradict the government's evidence that the rate of domestic violence recidivism is high. Nor has he directly proved that if a domestic abuser has not committed domestic violence for fifteen years, that abuser is highly unlikely to do so again. In the absence of such evidence, we conclude that the application of § 922(g)(9) to Chovan is substantially related to the government's important interest of preventing domestic gun violence.
>
> Finally, we note that if Chovan's as-applied challenge succeeds, a significant exception to § 922(g)(9) would emerge. If Congress had wanted § 922(g)(9) to apply only to individuals with recent domestic violence convictions, it could have easily created a limited duration rather than lifetime ban. Or it could have created a good behavior clause under which individuals without new domestic violence arrests or charges within a certain number of years of conviction would automatically regain their rights to possess firearms. But Congress did not do so. Congress permissibly created a broad statute that only excepts those individuals with expunged, pardoned, or set aside convictions and those individuals who have had their civil rights restored. *See Skoien*, 614 F.3d at 641 ("[S]ome categorical disqualifications are permissible: Congress is not limited to

> case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court."). The breadth of the statute and the narrowness of these exceptions reflect Congress's express intent to establish a "zero tolerance policy" towards guns and domestic violence.

*Chovan*, 735 F.3d at 1142.  The Court adopts this reasoning and concludes that Stimmel is not afforded rights simply by virtue of being conviction-free for numerous years.  The Court also notes that Stimmel's assertion that he is law abiding offers him support to seek pardon – the remedy he contends is inadequate without having even sought it.

In summary, the prohibition imposed by § 922(g)(9) does not violate the Second Amendment.  Stimmel's facial and as-applied challenges fail as a matter of law.

The Court now turns to Stimmel's equal protection claims.  With respect to his first equal protection claim, styled "Selective funding of 18 U.S.C. § 925(c) only for corporations and not individual persons violates the Equal Protection Clause of the Fifth Amendment," Stimmel has not responded in any manner to the Government's substantive arguments.  Accordingly, he has waived any opposition to the motion to dismiss this count of the complaint.

In his second claim regarding equal protection, Stimmel claims his rights are violated because individuals under § 922(g)(4) have been given access to courts for review of agency inaction and he has not as an individual under § 922(g)(9).  The Court has little problem concluding that Stimmel is not similarly situated to those permitted to seek review.  Section 922(g)(4) prohibits firearm possession by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution." Unlike § 922(g)(9), § (g)(4) targets the non-volitional act of being committed, along with targeting potentially non-violent and law abiding persons.  In contrast, § (g)(9) targets the

14

volitional act of domestic violence, specifically targeting violent and non-law abiding citizens.  As such, Stimmel cannot demonstrate that he is similarly situated to those afforded access to courts under the 2007 NICS Improvement Amendments Act of 2007. His final claim based on equal protection therefore fails.

**IV. Conclusion**

Having found that all four of Stimmel's claims must fail, the Government's motion to dismiss is hereby GRANTED.  The complaint is hereby dismissed.


IT IS SO ORDERED.


September 28, 2015                          _____/s/ Judge John R. Adams_____
Date                                        JUDGE JOHN R. ADAMS
                                            UNITED STATES DISTRICT COURT